[No. A055336. First Dist., Div. One. Oct. 21, 1993.]

ROBERT W. COPELAND et al., Plaintiffs and Respondents, v.
CITY OF OAKLAND et al., Defendants and Appellants.

COUNSEL

Jayne W. Williams, City Attorney, Randolph W. Hall, Assistant City Attorney, James Armstrong, Assistant to the City Attorney, and Catherine M. Steane, Deputy City Attorney, for Defendants and Appellants.

Charles J. Katz for Plaintiffs and Respondents.

## OPINION

**DOSSEE, J.**—The City of Oakland appeals from a judgment in favor of Robert W. Copeland and his wife, Margaret Copeland, in a personal injury case arising out of the overturn of their truck at an intersection in Oakland. The city argues that there was insufficient evidence that it had accepted the street on which the accident occurred into the city's street system. Absent such acceptance, the city would be immune from liability pursuant to Streets and Highways Code section 1806.[1] We find that there was substantial evidence of acceptance of the street and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On August 18, 1984, Copeland was driving his tractor-trailer rig, making a right turn from Seventh Street to Maritime Street in Oakland, when he felt

---

[1]Unless otherwise indicated, all statutory references are to the Streets and Highways Code.

the left wheels of the trailer drop into a storm drain grating and the right wheel begin to lift off the ground. This caused the entire rig to tip over and fall on its left side. Copeland and his wife, who was a passenger in the truck, were seriously injured. The Copelands' claim against the city was denied, and they filed an action in superior court.

The storm drain, located in the traveled portion of Maritime Street, had been constructed in such a fashion as to tilt the roadway against the direction of vehicles making a right turn onto Maritime from Seventh Street. The paving from the curb edge of the roadway was sloped toward the drain inlet, causing what is known as a "negative superelevation." This defect was compounded by successive patching of the asphalt around the inlet which left the inlet six inches lower than the surrounding roadway. An expert testifying at the trial stated that the inlet was located in the traveled portion of the road in a position where vehicles making a right turn onto Maritime Street would drive over it. The expert testified that the construction of the inlet and the pavement around it caused a significant defect in the road.

Prior to the beginning of the jury portion of the trial, the parties agreed to a separate trial on the city's affirmative defense of section 1806. Following the presentation of evidence and argument, the court ruled that the area of the accident was within a dedicated public street within the city street system and that the immunity of section 1806 did not apply. The jury trial followed, and the jury eventually rendered a special verdict finding Robert Copeland to be 75 percent responsible for the accident and the city to be 25 percent responsible. Judgment was entered in the amount of $107,340.75 for Robert Copeland and $9,329.75 for Margaret Copeland. The city's motion for a judgment notwithstanding the verdict was denied, and the city appealed.[2]

## DISCUSSION

The city argues that the adverse decision on its special defense of immunity was unsupported by substantial evidence.[3] We have examined the court's written decision as well as the evidence and documents presented to the court. We conclude that there was substantial evidence that the relevant portion of the street was accepted by resolution of the city into its system of streets.

[2]The Copelands filed a notice of cross-appeal, specifying the award of $20,000 in noneconomic damages as the subject of the appeal. Since this issue was not briefed, we deem the cross-appeal to be abandoned.

[3]The parties agree that the section 1806 immunity refers to liability for failure to maintain the road and not to affirmative acts which create dangers in the road.

*The Immunity of Section 1806*

At all times relevant to this case, section 1806 provided: "No public or private street or road shall become a city street or road until and unless the governing body, by resolution, has caused said street or road to be accepted into the city street system; nor shall any city be held liable for failure to maintain any road unless and until it has been accepted into the city street system by resolution of the governing body."[4]

This provision was enacted in 1957, apparently in response to the decision in *Union Transp. Co. v. Sacramento County* (1954) 42 Cal.2d 235 [267 P.2d 10] (*Union Transportation*). The court in *Union Transportation* held that a county could be liable for the defective condition of a bridge located on a road that had never been dedicated to or accepted by the county as a part of its system of roads. The theory of the case was that continuous use by the public for 12 years, coupled with official action by the county in performing repairs and maintenance of the road, resulted in a common law dedication by implication. (*Id.*, at pp. 240-241.) The addition of section 1806 to the Streets and Highways Code eliminated governmental liability for failure to maintain a road unless there is an express acceptance of the road by formal resolution.

At the trial of this defense, the Copelands submitted several documents tracing the history of Maritime Street. The first document was an ordinance passed by the Oakland City Council on July 5, 1910. The ordinance granted a franchise to the San Francisco, Oakland and San Jose Consolidated Railway to construct and operate railroad facilities. As a condition of granting the franchise, the ordinance required the railway company to convey to the city the title to Maritime Street, including the Seventh Street area. The railway company accepted the franchise, and the deed granting the property to the city was recorded on October 10, 1910.

In 1941, the Port of Oakland enacted an ordinance in which the port determined "it is necessary and convenient that a public street and highway be opened on and over those certain lands . . ." describing Maritime Street. That ordinance also declared, "The lands above described hereby are dedicated and set apart for such street and such street shall be known and designated as 'Maritime Street' . . . ." The board of port commissioners called on the city council to "initiate and carry to completion the proceedings necessary to effect such dedication and opening."

This request from the port was answered by the city council in Resolution No. 10725, adopted on August 28, 1941. In that resolution, the city stated

---

[4]A 1991 amendment to section 1806 provided for certain exceptions which have no impact on the instant case.

that "it is necessary and convenient that a public street and highway be opened on and over those certain lands belonging to and situate in the city, . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"BE IT FURTHER RESOLVED: That the lands above described are hereby dedicated and set apart for public . . . highway purposes . . . ." The resolution opening the street concluded by stating "That said public street shall be known and designated as Maritime Street . . . ."[5] Thus, it appears that Resolution No. 10725 did three things: it opened a street over city-owned property; it dedicated the land to public street purposes; and it named the street it had just opened.

The city in the instant case concedes that Maritime Street is a public street. It also concedes that it is a "dedicated" public street. It bases its immunity argument on a 1978 opinion of the California Attorney General which indicates that a two-step process is required in order to impose liability on a city or county for failure to maintain a road. (61 Ops.Cal.Atty.Gen. 466, 468-469 (1978).)[6] Thus, according to the city, "Consequently, a two-step procedure is required for imposing upon a county the responsibility of maintaining roads dedicated to public use. First, the offer of dedication is accepted, making them 'public roads'; second, if the roads generally meet county highway construction standards, the appropriate resolution is passed, accepting the roads into the county highway system and thus the responsibility for their maintenance. [Citations.]" (*Ibid.*) The city relies on the fact that none of the documents admitted at the mini-trial expressly states that Maritime Street is accepted into the city street system.

We conclude that the precise language used in section 1806 need not be found in a resolution in order to indicate acceptance of the street as a public

---

[5]Other evidence was admitted which indicated that the city had, at various times, passed resolutions authorizing the United States government to use Maritime Street. During World War II, the federal government instituted condemnation proceedings which resulted in the city deeding the fee title to the United States government while retaining an easement "for railroad and highway purposes" to Maritime Street. In 1964, the city attorney submitted his written opinion to the superintendent of streets that Maritime Street, by virtue of Resolution No. 10725 opening the street, was a dedicated public street, opened in accordance with the relevant provision of the city charter, and that the city had the duty to maintain it. A letter from the Army in 1971 indicated that the Army had been maintaining the street but wanted the city to take over maintenance. The city manager wrote to the Army, agreeing to accept maintenance responsibility for "the existing four travel lanes" but not the "areas outside of the travelled way, and thus the shoulder areas and connections to the non-public streets would be the adjoining property owners' responsibility." In 1984, the city passed Resolution No. 61980, determining that a contract to improve Maritime Street should be awarded to Gallagher & Burk, Inc. The contemplated construction had not been done at the time of the Copelands' accident.

[6]Section 941 provides the same immunity for counties as section 1806 provides for cities.

street within a city's system. The opinion of the Attorney General on which the city relies is not strictly applicable to the instant case. The cited opinion was interpreting the provisions of the Subdivision Map Act (Gov. Code, §§ 66410-66499.37). (61 Ops.Cal.Atty.Gen., *supra*, at p. 467.) Thus, in discussing the concept of dedication, the opinion states: "The significance of accepting an offer of dedication is that the property is thereafter held in trust for public use; the property is no longer subject to private control. [Citation.] It does not follow, however, that property open to public use must be maintained by the governing body that accepted the offer of dedication." (*Id.*, at p. 468.) One of the main purposes of the Subdivision Map Act is to require developers to put streets in the proper condition prior to the city taking over maintenance. (*County of Kern* v. *Edgemont Dev. Corp.* (1963) 222 Cal.App.2d 874, 879 [35 Cal.Rptr. 629].) For that reason, the Subdivision Map Act allows conditional acceptance of the streets proposed to be dedicated. (Gov. Code, § 66477.1.) The conditional nature of the public entity's acceptance prevents the creation of public liability for the street until the dedication is unconditionally accepted. (*Mikels* v. *Rager* (1991) 232 Cal.App.3d 334, 354 [284 Cal.Rptr. 87].)

In the instant case, however, it is not private subdivision land that was dedicated to a public purpose, it was land the city itself had owned since 1910. The city has the power to dedicate its own land to a public purpose. (*City of Oakland* v. *Burns* (1956) 46 Cal.2d 401, 405 [296 P.2d 333].) " '. . . [W]hen a formal dedication of a street is made by the State or by a municipality, no acceptance is necessary.' " (*Arques* v. *Sausalito* (1954) 126 Cal.App.2d 403, 406 [272 P.2d 58].) Thus, when a city dedicates its own land for public use, there is no two-step procedure as described in the cited Attorney General's opinion.

When a city makes a dedication, the manner of offering the property for a public use is regulated by the city charter. (*City of Oakland* v. *Burns*, *supra*, 46 Cal.2d 401, 405.) Thus, in the *Burns* case, as in the instant case, the manner in which the City of Oakland can open public streets in the port area is set out in the city charter. The charter provides for a resolution from the port determining the necessity to open a public street and a second resolution from the city council initiating and carrying out the necessary proceedings. (*Id.*, at pp. 405-406.) This provision of the city charter was cited in the instant case in the city attorney's letter to the city manager (superintendent of streets) in 1964. This was apparently the procedure used in 1941, when the city and the port passed resolutions which resulted in the city dedicating its property for use as a public street, naming it Maritime Street, and opening it for the public use. By this resolution, the city took the formal action contemplated by section 1806 (although the immunity statute was not passed for another 16 years) to include Maritime Street in the city's street system.

Our conclusion is buttressed by the other evidence submitted to the court which demonstrated that the city treated Maritime Street as though it had accepted the street as a part of the city street system. We are not, as the city charges, reverting to the *Union Transportation* doctrine of implied dedication. Rather, we merely view the additional documentation as evidence that the city officials intended to, and did, accept the street and the consequential liability.[7] Based on our interpretation of the relevant law, we find that there was substantial evidence for the trial court's conclusion that the city is not shielded by the immunity for unaccepted streets in section 1806.

### CONCLUSION

The judgment is affirmed.

Strankman, P. J., and Stein, J., concurred.

---

[7]In light of our conclusion, we need not address the arguments regarding retroactive application of section 1806 or whether the city actually constructed the defect in the road.