Filed 8/28/13  P. v. Simon CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G045927 |
| v. | (Super. Ct. No. 08NF4115) |
| STANLEY MILES SIMON, JR., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed in part and reversed in part.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

An amended information charged Stanley Miles Simon, Jr., Yolanda Brown, Charles Michael Reynolds, and Nicholas Diogenes Valerio with murder (Pen. Code, § 187, subd. (a); count 1),[1] premeditated attempted murder (§§ 664, subd. (a), 187, subd. (a); count 2), second degree robbery (§§ 211, 212.5, subd. (c); counts 3 and 4), and active participation in a criminal street gang (§ 186.22, subd. (a); count 5).  It further alleged counts 1, 2, 3 and 4 were committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)), count 1 was committed under the special circumstances of murder for the benefit of a criminal street gang by gang members (§ 190.2, subdivision (a)(22)) and murder during the perpetration of a robbery (§ 190.2, subdivision (a)(17)(A)), and as to counts 1 and 2 personal discharge of a firearm by a gang member (§ 12022.53, subds. (c), (e)(1)) and personal discharge of a firearm by a gang member causing serious bodily injury (§ 12022.53, subd. (d)).

A jury convicted Simon on all counts and found true the special circumstance allegations and all gang and firearm sentence enhancements.  As to count 2 the jury found not true the premeditation allegation.  The trial court denied Simon's new trial motion and sentenced him to an indeterminate term of life without the possibility of parole (LWOP), plus 20 years.

On appeal, Simon challenges the trial court's denial of his *Wheeler-Batson* motion,[2] giving of CALCRIM No. 1603 on aider and abettor liability as applied to robbery, refusal to give CALCRIM No. 3403 on the defense of necessity, and failure to give CALCRIM No. 240 on causation sua sponte.  He also challenges the sufficiency of the evidence to prove he either killed Jones himself or aided and abetted the killer as

---

[1]  All further statutory references are to the Penal Code.  The codefendants were tried separately and they are not parties to this appeal.

[2]  *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

required under section 190.2, subdivisions (a)(22) and (c). We agree the evidence is insufficient to support the jury's true finding on the section 190.2, subdivision (a)(22) gang murder special circumstance. We reject Simon's other contentions and affirm the judgment in all other respects.

FACTS

In the early morning hours of March 17, 2006, Armand Jones, a young, African-American actor of some promise, was shot during a robbery at a Denny's restaurant in Anaheim.

The evening had begun with Jones and several of his friends, including Dwayne Washington, Giovanni Boyd, and Brent Hurd, dancing at the Boogie nightclub in Anaheim. The young men were well-dressed and wearing expensive looking diamond stud earrings, gold chain necklaces, and gold watches.

After the nightclub closed, Jones, Washington, Boyd, and Hurd went to a nearby Denny's. They met Ronnell Spencer and some women that they had just met at the nightclub, and the group of about 10 people sat down to eat. Washington and Boyd got up to use the restroom. Washington went to the urinal while Boyd went into a stall. Washington was waiting for Boyd when several African-American males and one African-American female, who dressed as a male, entered the restroom together. They asked Washington, "Where you from[,]" and demanded he give them all of his "stuff." When Washington hesitated, one of the men pulled out a black revolver and pointed it at his face. He said to Washington, "Give me all your stuff. And if you go outside and say anything, I'll blow your fucking head off." Words were exchanged before the gunman ripped a gold chain from Washington's neck. This man and the woman went through Washington's pockets and took his cell phone and shoes.

3

Washington did not look at the gunman's face, but he later told police the gunman had been wearing a black and gold Pittsburgh Pirates baseball cap, black shirt, black jeans, and a black hooded sweatshirt. After doing some research on MySpace and talking to other people, Washington told police Damon Hill from the Rollin 20's criminal street gang might have been the one who wore the Pirates cap and used the gun. Washington also recognized Jarrell Kelly, and he later identified Yolanda Brown. He knew these three people associated with the Rollin 20's, and he identified the Pirates cap as a symbol of the Rollin 20's.

Boyd heard a commotion behind him and some people asking, "Where you from[?]." When he turned around, Boyd saw one man in the stall with him and two other men at the stall door. The first man, who may have been Nicholas Valerio, took Boyd's gold chain and shoes and then left the stall. A second male entered the stall with a semiautomatic handgun and took his car keys, cash, and cell phone. Boyd later identified this person as Damon Hill. Then a third person walked into the stall and went through Boyd's clothing, looking for items to steal, but found nothing. Boyd heard one of the robbers say, "This is 20's" or "We're 20's."

Meanwhile, Jones became impatient when his friends Boyd and Washington did not return from the restroom. As he entered the restroom to check on his friends, the man in the Pirates cap put away his gun, turned, and grabbed the gold necklace from around Jones's neck. Jones fought back and the robbers ran out of the restroom. One of them pushed Jones to the ground. Hurd got up from the table and helped Jones to the door. When Hurd and Jones ran outside, a volley of gunfire erupted.

Spencer saw Jones run out of the restroom and followed him outside. He saw a gun lying on the floor of the restaurant, picked it up, and ran outside.[3] Once outside, Spencer exchanged gunfire with the assailants while running for cover. He fired

---

[3] A friend of several Rollin 20's associates testified Spencer pulled the gun from his waistband.

4

nine shots and emptied the gun before seeking shelter behind a car. After he reached a place of safety, someone came up to him and shot him in the head.

When the shooting stopped, Jones stumbled back into the restaurant, holding his chest and asking for help. He collapsed on the floor and died from a gunshot wound to the chest.

The following day, Anaheim Police Officer Eddie Gomez retrieved surveillance footage from the parking lot of the Boogie nightclub. Anaheim Police Detective Kerry Condon reviewed the footage and recognized Brown and Valerio from the Rollin 20's. He also heard another Rollin 20's gang member, Keith Cantrell, refer to a man dressed in black pants, a black shirt, and a gold and black Pirates cap as "Stan."

One gun, a Glock .45-caliber semiautomatic handgun, was recovered at the scene of the shooting. One month later, a nine-millimeter handgun was recovered during the investigation of an unrelated shooting. Ballistics evidence indicated four guns had been used during the shooting, two nine-millimeter handguns, a .357-caliber revolver, and a second .357- or .38-caliber revolver. Jones was killed with a .357- or .38-caliber revolver.

*1. Simon's Pretrial Statement*

In May, 2010, Condon interviewed Simon. After waiving his *Miranda* rights,[4] Simon first denied any knowledge of Anaheim, or a shooting at the Denny's restaurant. When Condon told him he had witness statements, photographs, and videotape proving his involvement in the crime, Simon admitted waiting in the Boogie's parking lot and going into the Denny's bathroom before anything happened. He denied any participation in the shooting or robbery.

---

4 *Miranda v. Arizona* (1966) 384 U.S. 436.

5

## 2. Trial Testimony

### a. Damon Hill

Hill, a convicted felon who was facing a sentence of life without the possibility of parole for his participation in the instant crimes, testified against Simon because it was "the right thing," and in the hope he would receive some type of consideration in his own case. But he received no express or implied promise of leniency in exchange for his testimony. He also said testifying against a member or associate of his gang, the Rollin 20's, would endanger his life and the lives of his family members.

According to Hill, the Rollin 20's gang is located on the east side of Long Beach. Two of the gang's rivals are the Insane Crips and East Side Longo criminal street gangs. He identified Jarrell Kelly (Chocolate, Choc), Brown (Ya-Ya), Brown's cousin, Valerio, Dwight Seay (Tall), Reynolds (Banks), and Simon (Stiky Stan) as fellow Rollin 20's gang members or associates. Hill admitted associating with the Rollin 20's, and said he had three gang monikers, Holyfield, Young Hillside, and 50.

Hill testified he, several members and associates of Rollin 20's, and some of their friends, drove caravan style to the Boogie nightclub from their homes in Long Beach in the late hours of March 16. He remembered that a fight occurred in the Boogie's parking lot, and he said Simon, Reynolds, and Brown were yelling "20's and this is 20's," during the scuffle. He also heard some other people wearing the color purple claim the Grape Street Watts Crips gang.

Many people in Hill's party decided to go to a nearby Denny's after the Boogie closed. They socialized in the parking lot before everyone went inside the Denny's. Hill said the whole group went to the general area of the restrooms, and Simon and Brown were the first to enter the men's restroom. The restroom was crowded before Hill entered it. According to Hill, Simon, Brown, Kelly, and Reynolds had one guy surrounded, and Valerio and Calvin Thomas had another guy pinned in the bathroom

6

stall. Reynolds had a .357-caliber handgun, Simon had a revolver, and Kelly had a nine-millimeter handgun. Hill knew an armed robbery was in progress and he decided to help.

Hill testified Boyd recognized Kelly and said something like, "Hey. I know you. Why you letting your homeboys do me like this?" Reynolds yelled out, "20's cuz. This is 20's." Hill turned to leave the restroom just as Jones opened the restroom door. Reynolds bumped into Jones, and Jones said, "What the fuck's going on?" Reynolds replied, "Give me your chain." Jones said, "Hell, no[,]" and Reynolds tried to rip it from his neck. Reynolds and Jones got into a fist fight, and the rush of people out of the restroom knocked Jones to the floor.

On his way out of the restaurant, Hill saw Spencer "waving a gun around like 'y'all robbed my homeboy.'" Hill heard gunshots. He thought Spencer was trying to shoot him and ducked down behind a car. He heard several more gunshots, which seemed to be coming from all directions. He saw Reynolds shoot Jones. Hill flagged down Valerio's Ford Explorer and jumped inside. It was then that Hill noticed Simon and another gang member or associate in the back of the Explorer. Simon was holding the gun he used in the robbery on his lap. He told Hill, "I domed that nigga."


*b. Jeremiah Rodriguez*

Jeremiah Rodriguez agreed to testify for the prosecution in exchange for a reduced term on crimes unrelated to the shooting. He claimed to have met Simon while both were incarcerated. They did not share a cell, but Rodriguez and Simon struck up a conversation during the times inmates were permitted to socialize with each other.

Rodriguez testified Simon told him about the March 17 shooting, and he had the foresight to make notes of these conversations. According to Rodriguez, Simon admitted he had been at the Boogie nightclub during the late hours of March 16. There had been a scuffle in the Boogie's parking lot when Simon and Hill tried to rob a

Hispanic male who had been driving around the parking lot while flaunting a large amount of money.

A video surveillance camera captured this incident. In fact, the video from the parking lot shows one Rollin 20's gang member pulling on the sleeve of a person dressed in black and saying, "Come on, Stan." And, Rodriguez claimed Simon showed him a black and white photograph made from the surveillance footage that depicted Simon in a Pirates cap and wearing a black shirt. Simon told him the Pirates cap was his "hood hat."

Simon also admitted going to a Denny's restaurant after the fight. In one version of the events, Simon told Rodriguez he had been in the restroom with two other men when Hill, Kelly, Reynolds, and Brown rushed in. Simon said he watched Hill and Kelly rob and hit the two men. Then Jones entered the restroom. Reynolds grabbed him and at gun point ripped the gold chain from around his neck. Jones fought back, which prompted Hill, Kelly, Reynolds, Brown, and Simon to flee the restroom.

After the robbery, Spencer chased two people out of the Denny's, pulled out a gun, and fired several shots at them. Simon said he had been armed with a snub-nose revolver, and he walked up behind Spencer and shot him in the back of the head. Simon told Rodriguez, "'I shot that bug nigga in the back of his head[,]'" and that he felt compelled to shoot Spencer because Spencer "was shooting at his homies." Simon also told Rodriguez he did not feel bad about the shooting because Spencer belonged to a rival gang and being shot is "part of gangbanging."

Simon confided to Rodriguez his concern about Seay "trying to tell on him," and he threatened to have another gang member talk to Seay's girlfriend. Simon was also angry at Kelly and Hill for the robbery, and he thought they were trying to make him take the blame. Simon stated Kelly had a nine-millimeter handgun with him and Reynolds had a .357-caliber handgun.

8

On another occasion, Simon mentioned to Rodriguez that he saw Washington and Boyd at the Boogie before the robbery, and said he was already in the restroom when they entered it. Washington and Boyd were texting when Valerio walked in followed by Kelly, Hill, Reynolds and Brown. Kelly pulled out a gun, and various members of the group grabbed the victims' gold chains, wallets, cell phones, and shoes. Simon claimed he did not steal anything, but he admitted roughing up the victims. Jones walked into the restroom during the robbery and Reynolds pulled a gun out and demanded his gold chain. When Jones refused and started a struggle, Reynolds released him and most of the group ran out of the restroom and into the Denny's parking lot. Simon claimed he walked out behind him and shot Spencer in the head. Simon claimed Spencer was in a gang called Insane, and that he shot Spencer because he shot at Kelly and Hill. Simon also told Rodriguez that he "was a gunner," and that Hill shot Jones.

On another day, Simon told Rodriguez that Hill and Kelly planned the robbery. Later, Hill bragged about getting Jones's gold chain. Reynolds and Brown also got gold chains out of the deal. Rodriguez asked Simon why he had roughed up two compliant robbery victims, and Simon said it was because "they kicked it with some guys that were from Insane." Simon claimed his gang moniker was Stiky Stan, and that the unusual spelling of sticky represented that he was an insane killer.

Rodriguez acknowledged he had received a deal for his testimony. He also admitted he had been Hill's cellmate, that Kelly was housed next door, and that both men had contact with him before Simon's arrest and incarceration.


*c. Ronnell Spencer*

Spencer testified he had been at the Boogie before he went to the Denny's. He remembered seeing Jones at Denny's and recognized him as a customer, but could not recall if he sat with Jones, Boyd, Washington, and Hurd before the robbery. He remembered sitting with his back to the restrooms when he heard a "commotion," turned

9

to look, and saw a fight in progress. During the fight, someone said there had been a robbery and the robbers had guns. Jones emerged from the area in front of the restrooms. Jones headed toward the Denny's entrance and Spencer followed him. There was a fight going on in the entry way and Spencer saw "several weapons." One of these weapons, a semiautomatic gun fell to the floor, and Spencer picked it up. He tried to grab Jones and stop him from running outside, but Jones ran out the front door and Spencer followed him. Spencer instantly heard gunshots and muzzle flashes, and he returned fire while running and seeking cover. He emptied the gun and ducked down behind a parked car. He heard something behind him and turned to look, and he immediately heard a loud noise and saw a bright flash of light. He thought he had been unconscious for a short time, but he remembered opening his eyes and seeing a woman standing over him. Later, he learned he had been shot in the head.

### d. Gang Expert Testimony

Long Beach Detective Sean Magee testified as the prosecution's gang expert. He explained the culture, habits, and activities of street gangs in general and the Rollin 20's gang in particular. His testimony included an explanation of gang signs and symbols, the significance of gang monikers or nicknames, and the concepts of backup and respect, and the means by which gang members individually and collectively use criminal activity to instill fear, intimidate rivals, and enhance their reputations. He further explained the role that weapons play in gang culture, particularly handguns, and testified guns form an important part of a gang's ability to protect its claimed turf, members, and their ability to commit violent crimes.

Magee described the Rollin 20's as a Long Beach criminal street gang with between 500 and 700 members, whose primary activities include illegal distribution of narcotics and guns, and the commission of robberies, murders, shootings, and assaults with deadly weapons. The gang claims the colors black and yellow. He indentified two

10

statutorily required predicate offenses involving Rollin 20's members Tracy Vaughn Paul, Jr., and Anthony Wayne Clark. Paul was convicted of a gang-related murder, possession of a firearm by a felon, and active participation in a criminal street gang in 2005. Clark was convicted of murder, attempted murder, and active participation in a criminal street gang in 2006.

Magee testified Simon had at least six prior contacts with law enforcement. On one occasion, Simon was wearing a black and gold Pirates hat. On another occasion, Simon was found in possession of a firearm, which he claimed he needed for protection from a rival gang called Compton Piru. Based on all of the available evidence, Magee opined Simon was an active participant of the Rollin 20's gang on March 17, 2006, as were Brown, Reynolds, Valerio, Hill, and Kelly. He also opined the instant crimes were committed for the benefit of, at the direction of, and in association with, the Rollin 20's gang. He based this opinion on the fact a group of Rollin 20's gang members acted in concert and one of them shouted the gang's name during the robbery. He said the gang benefitted from these crimes by enhancing their reputation and the receipt of stolen property.

### e. Ebony Aguilar

Ebony Aguilar, a friend of several Rollin 20's associates, had been in the Boogie and gone to the Denny's restaurant with the Rollin 20's group on the night of the shooting. While she was waiting for a table in the Denny's, she saw two young men go to the restroom, and then a group of people following them. Later, she saw a female run away from the restroom while waving a chain over her head and saying, "I got his chain." Hill followed the female, as did a man sitting at Jones's table, who had a gun, and then a group of other people. All of these people ran out the Denny's front door. Aguilar then heard several gunshots.

*3. Defense Case*

       *a. Simon's Testimony*

Simon testified on his own behalf. He admitted he had been a Rollin 20's gang member in March 2006. He had two monikers, "Boo" and "Sticky Stan." He said the name Sticky Stan referred to his abilities as a wide receiver and tight end in high school, and denied using the word "Stiky" because he was an insane killer.

Simon described going to the Boogie nightclub with some friends on March 16, 2006. They drove into the nightclub's parking lot, were searched by private security guards, but could find no parking. He did not have a gun, and he was not wearing a hat. Simon claimed he did not go inside the nightclub, but he admitted going into the Denny's restaurant to use the restroom. He claimed to have no contact with the two or three other individuals who came in behind him. As he attempted to exit the restroom, Hill, someone he knew and had a "bit of negative history" with, opened the door with some force and damaged Simon's shoes. They exchanged words, and as they did so, a number of other people came into the restroom, including Kelly. Simon walked out of the restaurant and into the parking lot. He was sitting in a car with a girl when he heard gunshots. Simon heard a volley of gunfire and he ducked down, but he never got out of his friend's car. When the shooting stopped, Simon's friend drove them back to Long Beach.

Simon denied planning or participating in the robbery, and he denied having or using a gun. He knew Rodriguez, but denied telling him anything about his case, much less admitting he participated in the robbery, admitted he told Hill he had "domed a nigga," or claimed to be a "gunner."

Simon's investigator testified she did not give him pictures or other discovery materials during his incarceration.

12

DISCUSSION

1. *Wheeler-Batson Motion*

　　　a. *Jury Selection*

Jury selection took two full days. Juror No. 178, an African-American man, was questioned on the morning of the second day. During the court's questioning, Juror No. 178 said he was a professional carpenter, with friends in law enforcement. He had once been arrested and had relatives who had been arrested and convicted of crimes. He had also been the victim of a crime, as had one of his cousins. His cousin had been killed during some type of gang-related violence, and he grew up in a neighborhood known for its criminal street gangs. Juror No. 178 also disclosed a recent cancer diagnosis for which he had received treatment. He said he was awaiting test results to determine if further treatment would be necessary. Juror No. 178 told the court he did not believe the test results would interfere with the trial.

Under the prosecutor's questioning, Juror No. 178 revealed that he had applied for a position with the Anaheim Police Department in the mid-1970's, but that his "test score was mixed up, and [he] never made it that far."

After questioning other members of the panel, both parties accepted the jury as constituted, including Juror No. 178. As prospective alternate jurors were being questioned, one seated regular juror, Juror No. 135, told the court he had received a message from his son, who was serving in the military in Iraq and Afghanistan. Juror No. 135 said his son would be returning home for a short visit to begin the following weekend. The court questioned Juror No. 135 about his plans to visit with his son, and the court and counsel discussed the matter during a brief unreported sidebar. Ultimately, the court excused Juror No. 135 on its own motion, thereby reopening jury selection.

Thereafter, both parties exercised further preemptory challenges to the previously accepted jury panel, and the court replaced these jurors. After the attorneys

13

concluded their questioning of the recently seated jurors, the defense again accepted the jury as constituted. The prosecutor then exercised a preemptory challenge to Juror No. 178, the African-American juror that had been accepted by both sides earlier in the day. Defense counsel objected, and the court cleared the courtroom.

Outside the presence of the jury, defense counsel clarified the basis for his objection as "*Wheeler*," asserting the prosecutor's exercise of a preemptory challenge to the only African-American juror in the remaining jury pool would prejudice the defense. The court responded with a brief recitation of the procedure required under *Batson v. Kentucky*, *supra*, 476 U.S. at page 79 and *People v. Wheeler*, *supra*, 22 Cal.3d 258, and made the following comments: "In observing this venire of 80 people when they came in, I believe we only had two – well, we had two – I won't say it in a negative way. Based on the random selection, I believe we had possibly two African-American jurors. [¶] I say possibly because juror badge 114 who was previously excused by stipulation was a woman who works for the Orange County Superior Court or for the Superior Court here in Orange County. Just looking at her visually, it was difficult to determine if she was African-American. I thought she was. [T]he parties stipulated to excuse her because I was informed – and I think it may well have been off the record by both counsel – that [the prosecutor] is prosecuting someone with the same last name who apparently was related to her."

The court also set forth what had transpired during the brief, unreported sidebar with counsel. Apparently, the prosecutor had sought to reopen voir dire for the purpose of excusing Juror No. 135, but the court decided to excuse Juror No. 135 on its own motion. The court then stated, "[the prosecutor] accepted [Juror No.] 178 and now you changed your mind. So I am going to find there's a prima facie showing which shifts the burden to you to provide a satisfactory non-race-based reason for challenging this single African-American juror, the only one that we have left."

14

The prosecutor explained his reasons, citing factors known to him both before and after he accepted the jury with Juror No. 178 in place. For instance, the prosecutor mentioned Juror No. 178's failed application to the Anaheim Police Department, his potential health issues, and the fact that he had both a cousin who had been killed as a result of gang violence and some personal familiarity with street gangs. In addition, the prosecutor stated, "The problem that I had with [Juror No.] 178 is, as we were getting towards the last 15 minutes, from about 11:45 till noon . . . Juror 178 was falling asleep. And I saw him nodding off on multiple occasions. In fact, I looked over; and I don't know how long he had been asleep, but he had been asleep during some questioning." The prosecutor also said he had told defense counsel about Juror No. 178 falling asleep during the noon recess, and the judge stated he had noticed Juror No. 178 sitting with his eyes closed on several occasions throughout voir dire, although the judge was not certain Juror No. 178 had been asleep.

Defense counsel agreed Juror No. 178 had been sitting with his eyes closed, but asserted he also appeared attentive. Furthermore, defense counsel argued Juror No. 178 seemed to have "a fairness based upon life experience that's critical to my client . . . ." Defense counsel summarized his concerns with the following observation: "[the prosecutor] wanted Juror [No.] 135 excused which then reopened voir dire. And I think that is a factor that I can't control; that be it – the motive may be as innocent as they may be. I don't think that allows the single and sole black African-American that's on this jury to be excluded, especially if it can be shown that it could be potentially a race-based decision. I just can't see it as race neutral based on where we are now." After carefully considering all of these arguments, the court denied the *Wheeler-Batson* motion, and specifically found the prosecutor's explanation credible and his exercise of a preemptory challenge to excuse Juror No. 178 non-discriminatory.

15

*b. Analysis*

"Both the state and federal Constitutions prohibit an advocate's use of peremptory challenges to exclude prospective jurors based on race." (*People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix*); *People v. Bonilla* (2007) 41 Cal.4th 313, 341 (*Bonilla*), citing *Wheeler*, *supra*, 22 Cal.3d 258, 276-277; *Batson*, *supra*, 476 U.S. 79, 97; *J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127, 130-131.) "There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination. [Citations.]" (*Bonilla*, *supra*, 41 Cal.4th at p. 341.)

A three-step procedure applies in state and federal Constitutional claims of juror discrimination. (*People v. Bell* (2007) 40 Cal.4th 582.) "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.]" (*Lenix*, *supra*, 44 Cal.4th at p. 612.)

The parties do not contest the trial court's finding defense counsel proved a prima facie case of discrimination. Nor is Simon contesting the second prong of the analysis, namely that the prosecutor here provided a race-neutral reason for his challenge. Simon limits his challenge to the third stage of a *Wheeler/Batson* inquiry, specifically the trial court's credibility assessment and finding defendant failed to prove purposeful discrimination.

Simon argues the court mistakenly believed the credibility determination is based on an evaluation of the prosecutor's truthfulness, and contends there was no evidence to support the prosecutor's perception Juror No. 178 fell asleep during voir dire.

16

He asserts the prosecutor's stated justification for dismissing Juror No. 178 had a disproportionate impact on his case, and the court could have used less drastic means to address the juror's purported sleepiness. He further faults the court and the prosecutor for not asking Juror No. 178 additional questions to determine if he had been asleep or just sitting with his eyes closed. We find none of these contentions persuasive.

Our review of the trial court's credibility assessment is deferential, "examining only whether substantial evidence supports its conclusions. [Citation.]" (*Lenix*, *supra*, 44 Cal.4th at p. 613.) "'Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.]" (*Ibid.*) "'So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*Id.* at p. 614) "'"[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." [Citation.]'" (*People v. Riccardi* (2012) 54 Cal.4th 758, 787.) But the trial court is in the best position to judge the prosecutor's demeanor, how reasonable his or her explanations are, and whether the proffered rationale has some basis in accepted trial strategy. (*Ibid.*) And, "'"the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" and will not be overturned unless clearly erroneous.' [Citations.]" (*Id.* at p. 787.)

Simon fails to demonstrate the trial court's credibility assessment and no purposeful discrimination finding was clearly erroneous. The question of whether Juror No. 178 was actually asleep or just sitting with his eyes closed is not dispositive. As the Attorney General points out, the prosecutor believed Juror No. 178 had been inattentive, and, inattentiveness alone is a legitimate reason to dismiss a potential juror. (See *People v. Ramirez* (2006) 39 Cal.4th 398, 456-457.)

17

Furthermore, there is no reason our inquiry should be limited to concerns which arose after both parties initially accepted Juror No. 178, as Simon suggests. The prosecutor also voiced concerns about Juror No. 178's earlier responses, namely his prior experience with criminal street gangs and gang violence, either of which could have prejudiced the prosecution's case. And, finally, although the juror did not believe his health challenges would disrupt trial, the prosecutor could have legitimately feared the consequences of negative test results on the conduct of the trial. In short, the prosecutor gave multiple, credible, nondiscriminatory justifications for dismissing Juror No. 178 based on his perceptions and trial strategy, and the trial court made a sincere and reasoned effort to evaluate those justifications. It is irrelevant that some of those justifications related to things discussed before the parties accepted the initial panel and some relate to things discussed after questioning was reopened.

With respect to disparate impact, Simon primarily relies on *Arlington v. Metro. Housing Dev.* (1977) 429 U.S. 252, 265-266 (*Arlington*) and *Washington v. Davis* (1976) 426 U.S. 229, 242 (*Washington*). But both of those cases discuss the disparate impact of official actions in other contexts. In *Arlington,* the petitioners, a housing development corporation sought to change the zoning of a particular development from single-family homes to higher density townhomes for low- and moderate-income tenants. When the request was denied, the corporation brought suit and alleged the denial of their request was racially discriminatory under the Fourteenth Amendment to the United States Constitution and the Fair Housing Act of 1968. In *Washington,* two African-American police officers filed suit against a police department, alleging the promotion polices of that department were racially discriminatory. Neither of these cases discusses racial discrimination in the context of voir dire in a criminal trial, nor does Simon explain how their analysis applies here.

With respect to the court's failure to further question Juror No. 178 to determine if he had in fact been asleep or merely resting his eyes, we do not find this lone

18

fact sufficient to upset the trial court's credibility ruling. Simon relies on *Miller-El v. Dretke* (2005) 545 U.S. 231, 246, 250 (*Miller*), footnote 8 and *Kesser v. Cambra* (9th Cir. 2006) 465 F.3d 351, 364 (*Kesser*), for the proposition the court had an affirmative duty to further question Juror No. 178, but his reliance is misplaced. In *Miller*, there was ample evidence of racial bias, and little evidence supporting the prosecutor's credibility. In a panel of 108 people, there were 20 members of African-American descent, yet only one served. Nine had been excused for cause or by mutual agreement, but 10 were peremptorily struck by the prosecution. (*Miller*, *supra*, 545 U.S. at p. 239-241.)

In *Kesser*, the prosecutor gave several reasons for dismissing a Native American panel member, including the panel member's association with Native American culture. There, the prosecutor's stated belief was Native Americans are "'resistive'" and "'somewhat suspicious'" of the justice system. In addition, the prosecutor characterized the juror as "'pretentious'" because she tried to claim a work-related hardship and acted "'misty'" and "'emotional.'" (*Kesser*, *supra*, 465 F.3d at pp. 362-364.) While the Supreme Court did state, "the failure to ask undermines the persuasiveness of the claimed concern[,]" Simon plucks this phrase from a footnote discussing the state's assertion any pretextual use of peremptory challenges was mitigated by subsequent acceptance of an African-American juror. (*Miller*, *supra*, 545 U.S. at pp. 250-251, fn. 8) Similarly, Simon's lengthy quote from *Kesser* must be considered in light of the "'"totality of the relevant facts"'" as that analysis applies here. (*Kesser*, *supra*, 465 F.3d at p. 360.)

Simon also asserts Juror No. 178's "dozing off" did not warrant an "automatic dismissal." Of course Juror No. 178 was not automatically dismissed for dozing off, but even if he had been the cases Simon cites for this proposition are equally inapposite. *Bonilla*, *supra*, 41 Cal.4th at page 350, *People v. Bradford* (1997) 15 Cal.4th 1229, 1348-1349, *People v. Espinoza* (1992) 3 Cal.4th 806, 821, *People v. DeSantis* (1992) 2 Cal.4th 1198, 1233-1234, and *People v. Bowers* (2001) 87

19

Cal.App.4th 722, 731, all involved allegations a juror had been asleep during various portions of the trial, not during pretrial jury selection. And, while Simon suggests there were other, "less drastic" means available to the court to address the prosecutor's concerns, his argument is entirely based on the sole aspect of Juror No. 178's attentiveness. Simon essentially ignores the prosecutor's other stated reasons for dismissing Juror No. 178, all of which were facially race neutral, related to sound trial strategy, and credible.

For all of the foregoing reasons, we find Simon has not met his "burden of persuasion regarding racial motivation" (*Lenix*, *supra*, 44 Cal.4th at pp. 612-613), and we reject his contention the trial court's ruling on this issue violated his state and federal Constitutional rights.

2. *Jury Instructions*

   a. *General Principles and Observations*

A trial court must instruct on "general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case. [Citations.]" (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) In addition, the trial court must instruct upon "every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case. [Citations.]" (*Ibid.*)

On appeal, "[w]e determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] '"In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]'

20

[Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

The People asked the jury to find Simon guilty of the first degree murder of Jones under a felony-murder theory of murder committed during a robbery, or as a deliberate killing committed by an active participant in a criminal street gang and to further the activities of the gang. The prosecutor argued the evidence supported a finding of criminal liability as the direct perpetrator of the robbery, as an aider and abettor to the robbery, or as a member of an uncharged conspiracy to commit robbery. The defense argument focused on the questionable reliability of the prosecution's chief witnesses and evidence supporting Simon's claim he had nothing to do with the robbery. Defense counsel conceded Simon actively participated in the Rollin 20's, but asserted Jones's murder was not committed to further activities of the gang.

In keeping with the evidence and the parties' legal theories, the trial court gave general instructions on the duties of the judge and jury, how the jury should handle and evaluate the testimony of experts, accomplices, coconspirators and jailhouse informants, the burden of proof, and aider and abettor liability. The court further instructed on murder and its degrees, the felony-murder rule, two special circumstances (murder during the commission of a robbery and murder while an active participant in a criminal street gang), liability for coconspirators, and accomplice liability under the special circumstance of murder committed during the commission of a robbery, attempted murder with premeditation and deliberation, personal and intentional discharge of a firearm as either the perpetrator, coconspirator, or aider and abettor, first and second degree robbery and related instructions on liability for aiding and abetting the crime (CALCRIM No. 1603), active participation in a criminal street gang, the sentence enhancement for crimes committed for the benefit of, at the direction of, or in association

21

with criminal street gangs, and a unanimity instruction relating to the special circumstance of murder committed while an active gang member.

### b. CALCRIM No. 1603[5]

CALCRIM No. 1603 as given stated, "To be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while the perpetrator carried away the property to a place of temporary safety. [¶] A perpetrator has reached a place of temporary safety with the property if he or she has successfully escaped from the scene, is no longer being pursued, and has unchallenged possession of the property."

Simon claims CALCRIM No. 1603 permitted the jury to find him guilty of felony murder regardless of when he formed the intent necessary to aid and abet the perpetrator of the robbery. He claims his role in the robbery was "unclear," and while he admits the jury may have concluded he was part of the robbery from the outset, he argues it is also possible this instruction allowed the jury to convict him of the murder of Jones under the felony-murder theory, even if his actual participation did not begin until after Jones was killed.

He concedes the bench notes for CALCRIM No. 1603 state, "The court has a **sua sponte** duty to give this instruction when the defendant is charged with aiding and abetting a robbery and an issue exists about when the defendant allegedly formed the intent to aid and abet," citing *People v. Cooper* (1991) 53 Cal.3d 1158, 1165-1166. (Bold in original.) But he also points out the bench notes further state, "**Do not** give this instruction if the defendant is charged with felony murder." (Bold in original.)

_____

5 Simon expressly requested and argued this instruction at trial. Regardless of whether counsel invited the error by this request, as the Attorney General contends, we reach the merits if for no other reason than to forestall the inevitable ineffective assistance of counsel claim.

22

Although the second bench note does not cite any authority, it appears to be drawn from a long line of cases discussing the complicity of accomplices to a robbery for the homicidal act of another. (See *People v. Pulido* (1997) 15 Cal.4th 713, 719-724 (*Pulido*).) As *Pulido* observed while discussing CALJIC instructions later reformulated and restated in CALCRIM Nos. 1603 and 540B, an accomplice to a murder under the robbery aspect of the felony-murder theory must be jointly engaged in the robbery before or at the time the murder is committed. (*Id.* at pp. 728-729.)

In this case, the prosecution relied on the felony-murder theory to hold Simon responsible for Jones's death, based on the robberies of Washington and Boyd. Simon argues that because he did nothing to further these robberies until after Jones had been shot, the trial court should not have given CALCRIM No. 1603. Assuming he is correct, the alleged error does not mandate a reversal of the murder conviction.

Here, the factual question posed by the alleged error was "'necessarily resolved adversely to [Simon] under other, properly given instructions.' [Citation.]" (*Pulido*, *supra*, 15 Cal.4th at p. 726.) The court gave CALCRIM No. 401 on aiding abetting, which states in pertinent part, "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. *Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime*[.]" (Italics added.) The court also gave CALCRIM No. 540B regarding liability for first degree felony-murder by an aider and abettor or coconspirator. As given by the court, CALCRIM No. 540B provides in relevant part: "The defendant is charged in Count 1 [murder of Jones] with murder, under a theory of felony murder. [¶] The defendant may be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death . . . . [¶] To prove that the defendant is guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant (committed or attempted to

23

commit,/ or aided and abetted,/ or was a member of a conspiracy to commit), robbery; [¶] 2. The defendant (intended to commit,/ or intended to aid and abet the perpetrator in committing,/ or intended that one or more of the members of the conspiracy commit) robbery; [¶] 3. If the defendant did not personally commit or attempt to commit robbery, then a perpetrator, (whom the defendant was aiding and abetting/ or with whom the defendant conspired), personally committed or attempted to commit robbery; [¶] AND [or] 4. *While committing or attempting to commit robbery, the perpetrator caused the death of another person*(;/.) [¶] And [¶] 5. . . . A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent." (Italics added.)

The italicized portions of both instructions properly told the jury that in order to find Simon guilty of robbery and to find the robbery felony-murder special circumstance true, the People had to prove Simon formed the intent to commit the robbery, or act as an accomplice to the robbery, before or at the time Jones was shot. We view the instructions as a whole and presume jurors are able to correlate and follow the trial court's instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) We further presume the jury followed those instructions, regardless of the few inconsistent timing references the prosecutor made during closing argument. As the court told the jury, the court's instructions on the law trump the arguments of counsel. (CALCRIM No. 200.)

The jury returned a true finding on the robbery-murder special circumstance, and found Simon guilty of the robberies of Washington and Boyd. Thus, the jury necessarily determined Simon formed the requisite intent before or at the time Jones was shot under these other instructions concerning timing. Nothing in the record suggests any confusion on the part of the jury over this issue. Consequently, the error in giving CALCRIM No. 1603, if any, was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

24

### c. CALCRIM No. 3403-Defense of Necessity

At trial, defense counsel argued Simon participated in the robbery because he feared reprisals from his fellow gang members, and that he demonstrated this fear by ducking down in his car during the exchange of gunfire. In keeping with this theory, defense counsel requested instructions on the defenses of duress (CALCRIM No. 3402), and necessity (CALCRIM No. 3403). [6] The court expressed doubt about the duress instruction, noting Simon failed to show he was in immediate danger of reprisal from his fellow gang members. Simon then withdrew his request for the duress instruction.

As for the necessity instruction, the trial court asked defense counsel if he was aware of any case extending this defense to gang members voluntarily present at the scene of a gang-related crime. Defense counsel cited no such case. Ultimately, the court ruled, "having read a lot of cases in this area, I've never seen [necessity] extended to a situation . . . that involves voluntary gang membership, voluntary presence at an alleged

---

[6] CALCRIM No. 3403 states: "The defendant is not guilty of ___ *<insert crime[s]>* if (he/she) acted because of legal necessity. [¶] In order to establish this defense, the defendant must prove that: [¶] 1. (He/She) acted in an emergency to prevent a significant bodily harm or evil to (himself/herself/ [or] someone else); [¶] 2. (He/She) had no adequate legal alternative; [¶] 3. The defendant's acts did not create a greater danger than the one avoided; [¶] 4. When the defendant acted, (he/she) actually believed that the act was necessary to prevent the threatened harm or evil; [¶] 5. A reasonable person would also have believed that the act was necessary under the circumstances; [¶] AND [¶] 6. The defendant did not substantially contribute to the emergency. [¶] The defendant has the burden of proving this defense by a preponderance of the evidence. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the defendant must prove that it is more likely than not that each of the six listed items is true." (Boldface omitted.)

The bench notes for this instruction state, "The court must instruct on a defense when the defendant requests it and there is substantial evidence supporting the defense. The court has a **sua sponte** duty to instruction on a defense if there is substantial evidence supporting it and either the defendant is relying on it or it is not inconsistent with the defendant's theory of the case. [¶] When the court concludes that the defense is supported by substantial evidence and is inconsistent with the defendant's theory of the case, however, it should ascertain whether defendant wishes the instruction on this alternate theory. [Citations.]"

25

crime scene, and a situation in which the facts are in dispute as to whether or not the defendant did anything. [¶] I don't think the defendant's own testimony creates substantial evidence to give any of those instructions for the reasons I've discussed with both counsel. He never did anything, according to his testimony. He was only afraid outside when he was just in the car trying to protect himself. So he was fearful, but he didn't engage in any felonious conduct, according to him. [¶] And so I don't think it applies. And I just don't think that gang theory, although it is very creative . . . and perhaps in the long run will prove to be the law, respectfully, I don't think it's the law; therefore, I'm not going to instruct on [necessity]."

Simon now argues the trial court's refusal to give an instruction on the defense of necessity violated state and federal Constitutional provisions guaranteeing him the opportunity to present a defense. We disagree.

A criminal defendant is entitled to instruction on request "on any defense for which substantial evidence exists. [Citations.]" (*People v. Miceli* (2002) 104 Cal.App.4th 256, 267; *In re Christian S.* (1994*)* 7 Cal.4th 768, 783.) A criminal defendant seeking to rely on the necessity defense must demonstrate he or she violated the law "(1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency." (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035.) The evidence in this case is lacking with respect to all of these elements.

Simon's participation in the robberies, even assuming arguendo it was limited to assisting other gang members complete a robbery by shooting Spencer, in no way prevented any legally cognizable, significant evil. In fact, the opposite is true. He selected an alternative that exponentially increased the likelihood someone else would be hurt or killed. (See *People v. Bland* (1995) 10 Cal.4th 991, 996 [Legislature enacted sections 12022 and 12022.5 "'to deter persons from creating a potential for death or

26

injury resulting from the very presence of a firearm at the scene of a crime'"].) He certainly had other alternatives, including leaving the restaurant when he realized what his compatriots were doing, or not getting out of his car during the robbers' flight. As for his belief in the need to act, nothing suggests this belief, even assuming it was in good faith and objectively reasonable, so overwhelmed him no other course of action seemed possible. According to his own testimony, Simon had no problem walking out of the restroom when his fellow gang members burst in to rob Washington and Boyd. Moreover, in light of evidence favorable to the prosecution, Simon absolutely contributed to the criminal activity of his fellow gang members.

In sum, Simon cannot satisfy the substantial evidence requirement on any of the elements of the necessity defense, despite the gang expert's testimony his gang might have retaliated had he opted to sit still and do nothing to aid them in the flight with the loot. There was no error in refusing CALCRIM No. 3403 under these circumstances. To hold otherwise would be to legitimize criminal street gang culture in derogation of express public policy to the contrary. (See § 186.21.) No reported case has ever done so and we decline to do so here. There is no basis for extending the necessity defense to gang members voluntarily present at the scene of a gang-related crime initiated by members of his or her own gang.

### d. CALCRIM No. 240-Causation

Simon also contends Spencer's "legally unjustified assault with a deadly weapon/attempted murder" is an independent intervening cause that terminated his liability for Jones's death under the felony-murder theory. Simon points to testimony indicating Spencer already possessed the gun he later claimed to have found on the floor of the Denny's entryway, and a portion of Rodriguez's testimony recounting Simon's claim Spencer started the gunfight and he shot Spencer to defend his friends, as evidence

27

in support of his claim.  Moreover, Simon argues this evidence triggered the court's sua sponte duty to instruct the jury with CALCRIM No. 240.[7]  Again, we disagree.

In *People v. Cervantes* (2001) 26 Cal.4th 860 (*Cervantes*), the California Supreme Court had occasion to discuss proximate causation in the context of a provocative act murder prosecution.  (*Id.* at p. 866.)  The high court stated, "'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.]  However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.]  On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability.  "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause.  If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.]  '[ ]  The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough.  [ ]  The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the

_____

[7] The version of CALCRIM No. 240 in effect at the time of trial provided, "An act causes (injury/____<*insert other description*>) if the (injury/____<*insert other description*>) is the direct, natural, and probable consequence of the act and the (injury/____<*Insert other description*>) would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.  [¶] <*Give if multiple potential causes.*>  [¶] [There may be more than one cause of (injury/____<*insert other description*>).  An act causes (injury/____<*insert other description*>), only if it is a substantial factor in causing the (injury/____<*insert other description*>).  A substantial factor is more than a trivial or remote factor.  However, it does not have to be the only factor that causes the (injury/____<*insert other description*>).]"

28

kind which might result from his act.' [Citation.]" [Citation.]' [Citations.]" (*Id*. at p. 871.)

In *Cervantes*, members of different gangs attended the same party. The defendant, a member of the Highland Street gang, shot a member of the Alley Boys gang (Linares) in the arm and chest during a scuffle over a perceived slight to a woman associated with the Alley Boys. (*Cervantes*, *supra*, 26 Cal.4th at pp. 863-864.) A melee erupted with several participants yelling gang challenges. (*Ibid.*) A short time later, a group of Alley boys spotted a lone Highland Street gang member (Cabrera) and fired several shots, killing him. (*Id*. at p. 864.) At trial on charges he killed Cabrera, the defendant testified he did not intend to shoot anyone, and that he was driving away from the party when he heard several shots being fired. (*Ibid.*)

The California Supreme Court reversed the defendant's conviction, observing, "Defendant was not the initial aggressor in the incident that gave rise to the provocative act. There was no direct evidence that Cabrera's unidentified murderers were even present at the scene of the provocative act, i.e., in a position to actually witness defendant shoot Linares. Defendant himself was not present at the scene where Cabrera was fatally gunned down; the only evidence introduced on the point suggests he was already running away from the party or speeding off in his car when the victim was murdered." (*Cervantes*, *supra*, 26 Cal.4th at p. 872, fns. omitted.) The high court further observed, Cabrera's murderers "'intend[ed] to exploit the situation created by [defendant], but [were] not acting in concert with him,' a circumstance that is 'normally held to relieve the first actor [defendant] of criminal responsibility.' [Citations.]" (*Id*. at p. 874.)

Here, unlike *Cervantes,* Spencer took it upon himself to protect his friends during the course of a robbery, but there is no evidence he sought to exploit the situation caused by Simon and his fellow gang members. In fact, Spencer testified he tried to stop Jones from going outside. When he failed to do so and realized Jones was under fire

29

from various areas in the parking lot, he "prayed that [the gun he found] had bullets in it." In our view, Spencer stands in the shoes of a victim of the robbery or a responding police officer, and should not be considered an intervening or superseding cause cutting off Simon's liability for Jones's death. (See *Cervantes*, *supra*, 26 Cal.4th at p. 868; see also *People v. Gilbert* (1965) 63 Cal.2d 690, 704-705 [police officer kills accomplice] reversed on grounds not relevant here *sub nom. Gilbert v. California* (1967) 388 U.S. 263.)

Under established principles of causation, "[t]he defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 847.) A shooting death during a gang-related armed robbery like this is a reasonably foreseeable risk, not an extraordinary or abnormal occurrence. By way of contrast, if an airplane had fallen from the sky and killed Jones, Simon's argument would have merit. But here we see no reason for absolution simply because the victims' friend intervened as opposed to one of the victims himself or a responding peace officer.

The evidence shows Simon participated in two armed robberies in which more than one perpetrator possessed a gun. The crimes took place in a busy restaurant. Although a bystander's violent intervention was not inevitable, Spencer's involvement in the robbery is hardly the type of occurrence so remote and unusual that it would cut off the criminal liability of one of the robbery participants. "[I]t is impossible to see how it could reasonably be concluded that the death[] of [Jones] in such circumstances could have been an unnatural or improbable consequence of appellants' admitted acts." (*People v. Anderson* (1991) 233 Cal.App.3d 1646, 1662.)

Simon also argues Spencer's acts were not legally justifiable, and he "cannot be liable for the robbers' reaction to Spencer's independent, illegal, and lethal conduct." He has cited no authority for the proposition an intervening act cuts off

30

liability unless the intervening act is both foreseeable *and* legally justifiable. Furthermore, we are not prepared to find on this record that his acts fall outside of section 197's provision for justifiable homicide when the life of another is threatened, or as a justified act to apprehend those who had just robbed his friend. (See § 197, subds. (1), (4).)

Finally, as Simon concedes, the court gave CALCRIM No. 540B, which required the jury to find, among other things, a "logical connection" between the cause of Jones's death and the robbery, and that the connection between the robbery and murder was more than just their occurrence at the same "time and place." (See *People v. Cavitt* (2004) 33 Cal.4th 187, 201 [to satisfy the "complicity aspect" of the felony-murder rule, a nonkiller is responsible for a homicide committed by a cofelon when there is "a logical nexus, beyond mere coincidence of time and place, between the felony the parties were committing or attempting to commit and the act resulting in death"].) And, as the Attorney General notes, the trial court also gave CALCRIM Nos. 549 and 730, which informed the jury Simon could be convicted of felony murder only if it determined the act causing Jones's death and the robberies were part of one continuous transaction. Thus, there was no sua sponte obligation to instruct the jury with CALCRIM No. 240.

*3. The Gang Murder Special Circumstance*

In his opening brief, Simon challenged the sufficiency of the evidence to prove the criminal street gang special circumstance finding.[8] (§ 190.2, subd. (a)(22).) He argued no evidence demonstrated he aided and abetted whoever shot Jones *with the intent to kill* as required under section 190.2 subdivision (c). After oral argument, we

---

[8] To be clear, Simon does not even challenge the true felony-murder special circumstance finding (§ 190.2, subd. (a)(17)), and he expressly acknowledges that single special circumstance finding alone is sufficient to support the LWOP sentence if the robbery conviction is upheld.

requested further briefing on whether the jury was misdirected with respect to the criminal street gang special circumstance finding because the trial court added "reckless indifference to human life" as an alternative legal theory in response to a jury question. The Attorney General conceded the court misdirected the jury on this point, and also that the error was not harmless. We accept this concession.

Section 190.2, subdivision (a)(22) provides for a sentence of death or life without the possibility of parole for first degree murder when "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang . . . and the murder was carried out to further the activities of the criminal street gang." Subdivision (c) extends liability for first degree murder to "[e]very person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, request, or assists any actor in the commission of murder in the first degree . . . ." There is insufficient evidence to support a finding that Simon shot Jones. Consequently, the prosecution had the burden to prove Simon while an active participant in a criminal street gang aided and abetted another person to commit murder in the first degree, with the intent to kill and to further the activities of this gang. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 611.)

Neither the statute, nor case law support a theory of liability under section 190.2, subdivision (c) for aiding and abetting with a reckless disregard for human life rather than or in addition to the specific intent to kill. (See *People v. Pearson* (2012) 53 Cal.4th 306, 322 ["'reckless indifference' to human life, applies only to the felony-murder special circumstances listed in section 190.2, subdivision (a)(17)"].) But during the prosecutor's closing argument, the People asserted Simon could be found responsible for first degree murder for Jones's death whether either the robbery-murder or murder by an active participant in a criminal street gang if he acted either with intent to kill *or* with reckless indifference to human life.

Then, during deliberations, the jury submitted the following question: "We are uncomfortable with the language in the 4th [gang-related murder special circumstance verdict] form that implies the defendant intentionally murdered Mr. Jones. Is this form merely asking us to apply principals of aiding and abetting to the act of murder[?]." The court discussed the note with both counsel outside the jury's presence and concluded the problem arose because the verdict form only addressed specific intent to kill and was inconsistent with the other instructions. Convinced by the district attorney and over defense objection, the court then modified the verdict form to include the option of finding true the gang-related murder special circumstance if Simon participated in the robbery and did so with a reckless indifference to human life. This was error.

Subdivision (d) of section 190.2 specifically exempts robbery-murder felony murder from the specific intent requirement of subdivision (c). It does not list any of the other circumstances enumerated under section 190.2, subdivision (a) such as subdivision (a)(22). In fact, the trial court took steps to ensure CALCRIM No. 703, an instruction on section 190.2, subdivision (d), referenced only the robbery-murder special circumstance. But reckless disregard for human life does not suffice for a gang-related murder special circumstance when an active participant in a criminal street gang aids and abets a robbery. The Attorney General rightly concedes the error.

Furthermore, we agree with the Attorney General the error cannot be deemed harmless in this case because it is impossible to determine from other portions of the verdict on which of the two legal theories the jury relied to find true the gang-related murder special circumstance. (*People v. Perez* (2005) 35 Cal.4th 1219, 1233.) Thus, the true finding on the gang-related murder special circumstance must be reversed.

DISPOSITION

The jury's true finding on the gang-related murder special circumstance (§ 190.2, subd. (a)(22)) is reversed.  In all other respects, the judgment is affirmed.


THOMPSON, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.